Approved: _____          ORIGINAL
          MARCIA S. COHEN
          Assistant United States Attorney

Before:   THE HONORABLE JUDITH C. MCCARTHY
          United States Magistrate Judge
          Southern District of New York

- - - - - - - - - - - - - - - - - x      19 mag 7016

UNITED STATES OF AMERICA             :   **COMPLAINT**

          - v. -                     :   Violations of
                                         18 U.S.C. §§ 922(g)(1)
EDUARDO TALENTINO,                   :   and 2; 18 U.S.C.
                                         § 2423(a)
                    Defendant.       :
                                         COUNTY OF OFFENSE:
                                     :   ORANGE

                                     :

- - - - - - - - - - - - - - - - - X

SOUTHERN DISTRICT OF NEW YORK, ss.:

        Eugene T. Hagan, being duly sworn, deposes and says
that he is a Special Agent with the Federal Bureau of
Investigation, and charges as follows:

                         COUNT ONE

        1.   From on or about June 22, 2018, up through and
including on or about June 25, 2018, in the Southern District of
New York and elsewhere, EDUARDO TALENTINO, the defendant,
unlawfully, willfully and knowingly transported an individual
who had not attained the age of 18 years in interstate and
foreign commerce with the intent that the individual engage in
sexual activity for which any person can be charged with a
criminal offense, to wit, EDUARDO TALENTINO, the defendant,
transported a 16-year-old minor in his care, custody and control
("Victim-1") from Monroe, New York to Wheeling, West Virginia
and, once in West Virginia, engaged, and attempted to engage, in
illegal sexual activity with Victim-1 in violation of W.Va Code
§ 61-8D-5.

        (Title 18, United States Code, Section 2423(a).)

2

COUNT TWO

2.    From in or about August 2018, up to and including in or about February 2019, in the Southern District of New York, EDUARDO TALENTINO, the defendant, knowing that he had previously been convicted in a court of a crime punishable by imprisonment for a term exceeding one year, knowingly possessed a firearm, in and affecting commerce, to wit: a Colt Pocket Positive .32 caliber revolver; and the firearm was previously shipped and transported in and affecting interstate and foreign commerce.

(Title 18, United States Code, Sections 922(g)(1) and 2.)

The bases for my knowledge and for the foregoing charge are, in part, as follows:

3.    I am a Special Agent of the FBI, and I have been personally involved in the investigation of this matter.  This affidavit is based upon my personal participation in the investigation of this matter, my conversations with law enforcement agents, as well as my examination of reports and records.  Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation.  Where the contents of documents and the actions, statements and conversations of others are reported herein, they are reported in substance and in part.

4.    On or about February 15, 2019, the FBI received information from the Orange County Child Sexual Abuse Task Force concerning a report from a female minor ("Victim-1") concerning sexual contact with EDUARDO TALENTINO, the defendant. Victim-1, who was born in November 2001, turned 17 in November 2018.

5.    On a number of occasions in February and March 2019, another Special Agent with the FBI ("Agent-1") met with Victim-1. Based on my conversations with Agent-1 and my review of reports Agent-1 prepared, I am aware that Victim-1 advised the following, among other things:

a. In or about December 2017, EDUARDO TALENTINO, the defendant, and his wife became the guardians of Victim-1, and Victim-1 moved into their home (the "Home") in Monroe, New York. Victim-1 remained in the Home until on or about February 8, 2019.

3

b. During the entire time that Victim-1 lived at the Home, TALENTINO, his wife, and their two minor sons lived in the Home. At various other times, there were also other residents of the Home -- an adult female (the "Female-Resident"), and two other adult males.

c. Initially, after moving into the Home, Victim-1 slept in a bedroom in the Home, but in or about March 2017, TALENTINO told Victim-1 that her bedroom was "dark" and filled with "black smog." From that point on, at his direction, Victim-1 slept with TALENTINO on a blow-up mattress in the living room. TALENTINO said that this arrangement would "energize" him and would take her away from the "black smog."

d. On various occasions while Victim-1 was on the blow-up mattress with TALENTINO, they slept in a "spoon" position with him against her back and she could tell that he was sexually aroused because she could feel his penis pressing and grinding against her. On various occasions, he would tell her that he was "so hard" and "you don't know how bad I want you right now."

e. On numerous occasions, while at the Home, Victim-1 witnessed TALENTINO appearing to be "possessed" by both "angels and demons." On some of these occasions, TALENTINO purported to be the voice of God and spoke to Victim-1 as if he was God. On the occasions when TALENTINO appeared to be "possessed," he would throw himself on the ground and speak in various voices. During these times, Victim-1, TALENTINO's wife, and/or the Female-Resident would attend to TALENTINO and try to perform "exorcisms" on him.

f. At some point before June 2018, TALENTINO told Victim-1 that he believed that she was the reincarnation of his ex-wife and that he and Victim-1 were "twin flames."

g. On many occasions, TALENTINO expressed his desire to Victim-1 to "consummate their spiritual bond" by engaging in sexual intercourse. TALENTINO said that sexual intercourse with Victim-1 would "strengthen him." Victim-1 told him that she did not want to have sex with him. In or about June 2018, TALENTINO said that they would consummate their spiritual bond by engaging in a ritual submerging in a pool and he arranged for them to travel to West Virginia where he said there was a spiritual leader who would supervise the ritual submerging.

4

h. In late June 2018, Victim-1 traveled to West
Virginia with TALENTINO. The Female-Resident went with them so
that she could drive them because TALENTINO does not drive.   In
West Virginia, they stayed at a hotel for several nights.   At the
hotel, they had a single room with one bed. TALENTINO and Victim-
1 shared the bed.

i. While at the hotel in West Virginia, TALENTINO
attempted to touch Victim-1 sexually and she resisted.   At his
direction, Victim-1 touched his erect penis with her hand and
stroked it.   He told her that he wanted to "come all over her."

j. Upon returning to the Home in or about early July
2018, TALENTINO continued to sleep with Victim-1 on the blow-up
mattress in the living room of the Home, and TALENTINO continued
to request that Victim-1 engage in sexual activity with him. On
numerous occasions after the trip to West Virginia, TALENTINO put
his hands down Victim-1's pants at night and placed his hand over
Victim-1's underwear to touch and massage Victim-1's genital area.

k. On at least three occasions after the trip to West
Virginia, TALENTINO's wife drove TALENTINO and Victim-1 to various
hotels in New York. TALENTINO told Victim-1 that they needed to
stay overnight at the hotels because there were demons coming to
the house that were after TALENTINO and Victim-1.  On one of these
occasions, while Victim-1 was alone in a hotel room with TALENTINO,
TALENTINO appeared to be "possessed" and he kicked, punched, and
choked her. He threw her cellphone against the wall after yelling
and screaming at her.  He unbuttoned her jeans, unzipped them, and
reached down into her underwear. He put his fingers at the entrance
to her vagina and she forcibly bucked him away.  During this
encounter, TALENTINO pulled his pants down and exposed his penis
to her and told Victim-1 that he would "rape" her and that, if he
could not have her, he would "ruin her" so that no one else could
have her.

l. In or about August 2018, while at the Home,
TALENTINO showed Victim-1 a revolver and bullets for the revolver.
TALENTINO told her that the revolver was his first gun from his
first assignment with the FBI as a Special Agent.[1] TALENTINO told
Victim-1 that he kept the revolver in the Home for protection.
Victim-1 observed that TALENTINO kept the revolver in a suitcase-

---

[1] Based on my review of FBI databases, I know that EDUARDO
TALENTINO, the defendant, is not a Special Agent of the FBI, has
never been an FBI agent, and has never been employed by the FBI.

style case with a lock built into the case and he kept the case in his bedroom.   TALENTINO showed Victim-1 how to open the case by using a code, which was a series of zeros.

6.   Based on my conversations with an employee of Orange County Child Protective Services as well as my review of documents obtained from the Orange County Department of Social Service, including documents signed by Victim-1's mother, EDUARDO TALENTINO, the defendant, and TALENTINO's wife, I understand that, in or about December 2017, Victim-1's mother granted temporary custody of Victim-1 to EDUARDO TALENTINO, the defendant, and his wife.   This grant transferred physical and legal custody of Victim-1 to EDUARDO TALENTINO, the defendant, and his wife and was in effect at the time TALENTINO took Victim-1 to West Virginia in June 2018.

7.   Based on my conversations with a Senior Investigator with the New York State Police ("Investigator-1"), I am aware that, on or about February 8, 2019, the New York State Police executed a search warrant for an office that EDUARDO TALENTINO, the defendant, shared with another individual in Orange County, New York. Based on my conversations with Trooper-1 as well as my review of criminal records relating to TALENTINO, I am aware that, on or about February 8, 2019, TALENTINO was arrested and charged in Orange County with unauthorized practice of a profession.   Based on my conversations with Investigator-1, I understand that TALENTINO was practicing as a therapist despite not being licensed to practice therapy. In addition, in or about February 2019, a Family Court proceeding was initiated against TALENTINO and his wife, resulting in the removal of Victim-1 and their two children from the Home.

8.   I have obtained and reviewed records from a hotel in Wheeling, West Virginia (the "Hotel").   These records reflect that an individual who identified himself as "Eduardo Talentino" checked into the Hotel on June 22, 2018 and checked out on June 25, 2018.  The records reflect that there were two adults listed on the reservation and that the room issued to "Eduardo Talentino" had a single king-sized bed.  The records reflect that the charge for the room was $353.69 and that this amount was charged to a credit card issued to "Eduardo Talentino." In addition, the records include a copy of a New York State identification card ("Card") presented at the Hotel at the time of check-in.  I have reviewed the copy of the Card and compared the client identification number listed on it with records from

6

New York State Department of Motor Vehicles ("DMV") relating to
EDUARDO TALENTINO, the defendant.   The client identification
number on the copy of the Card matches the client identification
number on the records received from DMV relating to TALENTINO.

9.    On or about March 6, 2019, United States
Magistrate Judge Lisa Margaret Smith authorized a search of the
Home to search for evidence related to violations of Title 18,
United States Code, Sections 922(g), 2423(a), and 2422(b).   That
same day, I, along with other law enforcement officers, executed
the search warrant at the Home.   No guns were recovered from the
Home.

10.    On or about March 8, 2019, Investigator-1
interviewed a witness ("Witness-1") at Witness-1's home in
Chester, New York.   I joined that interview while it was in
progress. Based on my conversations with Investigator-1 and my
review of reports prepared by Investigator-1, I understand that,
before I arrived, Witness-1 advised, among other things, that he
met EDUARDO TALENTINO, the defendant, in or about 2008 or 2009
and they became friends.   Witness-1 advised that Witness-1 owns
a number of guns and invited Investigator-1 to look at his gun
collection. Among other things, Investigator-1 observed a black
case ("Case-1") under Witness-1's bed. Witness-1 gave permission
to Investigator-1 to open Case-1.   When Investigator-1 opened
Case-1, it contained the following: (1) a gun in a brown leather
holster, (2) a gray plastic case containing (i) a Colt Pocket
Positive .32 caliber revolver with a pearl handle and (ii)
several loose .32 caliber bullets, and (3) a green plastic
container containing approximately 49 bullets.   Witness-1
advised that TALENTINO brought Witness-1 Case-1 about a week ago
and that Witness-1 had instructed him to place Case-1 under
Witness-1's bed.   Witness-1 did not open Case-1 at that time nor
at any time thereafter.   After opening Case-1, Investigator-1
asked Witness-1 about the guns inside Case-1.   Witness-1
confirmed that both of the guns in Case-1 belonged to Witness-1.
According to Witness-1, Witness-1 had never given the guns to
TALENTINO or authorized him to take them from Witness-1's home.
With Witness-1's permission, I took custody of Case-1 and its
contents.   I observed that Case-1 contains a locking mechanism
and that the code "000" unlocks the case.

11.    On or about July 17, 2019, Agent-1 and I met with
Victim-1. Victim-1 described the gun she saw in the Home as a
black revolver with a pearl handle and said that she had seen
the gun on at least three different occasions.   She stated that
EDUARDO TALENTINO, the defendant, handled the gun and showed it

7

to her and told her that the gun was for defense purposes for
the people in the Home. She stated that he wanted to make sure
she knew where it was and how to use it, and that he showed her
how to open the lock on the case and how to load bullets in the
gun. On at least one occasion, TALENTINO also told her that the
gun had been his service revolver and that it was stolen in the
sense that he was not supposed to have kept it.  I showed
Victim-1 photographs of Case-1 and photographs of each of the
items contained in Case-1.  Victim-1 identified Case-1 as the
case she had seen in the Home. Victim-1 also identified the
photograph of the Colt Pocket Positive .32 caliber revolver as a
photograph of the gun she had seen in the Home.

        12.   I have reviewed criminal history records relating
to EDUARDO TALENTINO, the defendant.   These records reflect that
TALENTINO is approximately 53 years-old.   Further, the records
reflect that, in or about August 1997 in Boston, Massachusetts,
TALENTINO was convicted of Rape of a Child, which is a felony
punishable by imprisonment for more than one year. Based on my
review of the criminal history records, I know that TALENTINO
was sentenced to a term of imprisonment of four years and one
day, and incarcerated from on or about August 15, 1997 to on or
about November 8, 2000.

        13.   As part of my investigation of this matter, I
have been informed by an agent ("Agent-2") of the United States
Bureau of Alcohol, Tobacco and Firearms ("ATF"), which has data
on the manufacturing of ammunition and firearms, that the Colt
Pocket Positive .32 caliber revolver, was not manufactured in
the State of New York.

8

WHEREFORE, deponent respectfully requests that EDUARDO TALENTINO, the defendant, be arrested, and imprisoned or bailed, as the case may be.

_____
Special Agent Eugene T. Hagan
Federal Bureau of Investigation


Sworn to before me this
24 th day of July, 2019

_____
THE HONORABLE JUDITH C. MCCARTHY
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK